Salina M. Kanai #8096
Federal Public Defender

Craig W. Jerome #8797
First Assistant Federal Defender
300 Ala Moana Boulevard, Suite 7104
Honolulu, Hawaii  96850-5269
Telephone:  (808) 541-2521
Facsimile:   (808) 541-3545
E-Mail:      craig_jerome@fd.org

Attorneys For Defendant
RUMALDO VALDEZ

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 25-00112 JAO |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM; EXHIBITS A-D; |
| vs. | ) | CERTIFICATE OF SERVICE |
| | ) | |
| RUMALDO VALDEZ, | ) | |
| | ) | Date:          March 2, 2026 |
| Defendant. | ) | Time:          8:30 a.m. |
| | ) | Judge:     Hon. Jill A. Otake |
| _____ | ) | |

Salina M. Kanai #8096
Federal Public Defender

Craig W. Jerome #8797
First Assistant Federal Defender
300 Ala Moana Boulevard, Suite 7104
Honolulu, Hawaii  96850-5269
Telephone:   (808) 541-2521
Facsimile:   (808) 541-3545
E-Mail:       craig_jerome@fd.org

Attorneys For Defendant
RUMALDO VALDEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 25-00112 JAO |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| vs. | ) | |
| | ) | |
| RUMALDO VALDEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

At best, the government asks the Court to dance on an impossibly thin line in this case. *See* Government's Sentencing Memo, ECF No. 33, at PageID.395-98. The government suggests the Court undertake a "Goldilocks" approach to facts that are labeled "The Offense Conduct" in the PSR. *See id.;* PSR at ¶¶ 8-27. It's not clear how that approach might work as a practical matter, nor is it clear what the government hopes to achieve through its confusing request—other than, perhaps, avoiding sticky issues of double jeopardy and double punishment in Mr. Valdez's

pending federal case in the Eastern District of New York. The government clearly wants the Court to punish Mr. Valdez for the exploitation conduct that largely occurred when he was a juvenile.[1] But it provides no guideposts for what is the "just right" amount of punishment for that conduct. The government seemingly wants to have its cake and eat it, too—bringing the exploitation conduct to the Court's attention, arguing that conduct as aggravation, but trying to do so in a way that won't affect the sentence in Mr. Valdez's pending case. The Court's duty here is to consider the §3553(a) factors and impose a sentence that is sufficient, but not greater than necessary, to achieve the statutory purposes of sentencing. It need not try to puzzle out the impossible line that the government asks it to follow.

The government's proposed sentence—110 months (at least)—rests on their repeated attempts to shift the burden, their overstatement of certain aggravating facts, their ignoring significant mitigating factors, their speculation about certain facts, and a flawed guidelines range. The Court should take a more rounded approach, one that places aggravation and mitigation in their proper contexts and accounts for the deep flaws in the guidelines that apply to this offense. To begin with, the Court should, as a policy matter, decline to apply the anachronistic 2-level enhancement for use of a computer under §2G2.2(b)(6). For the reasons laid out in

---

[1] If they did not, there would be no reason for the government to mention (in a footnote) that there's no guarantee of a conviction in Mr. Valdez's pending case, so if this Court doesn't punish him for it, he might never be punished. ECF No. 33 at PageID.397 n.11.

the defendant's sentencing statement,[2] the Court should also decline to apply the 5-level increase for number of "images" under §2G2.2(b)(7) and §2G2.2, Application Note 6. It should, instead, apply a 2-level increase under 2G2.2(b)(7)(A), an increase that actually accounts for the reality that Mr. Valdez possessed 44 media files that qualify as child pornography—23 still photos and 21 videos.[3] *See* PSR at ¶ 51. These two adjustments would result in a total offense level of 25, and a guideline range of 57 to 71 months. A careful and complete application of all the aggravating and mitigating factors indicates that a sentence somewhere within *that* range—the defense suggests 60 months—is sufficient to achieve the goals of sentencing in this child pornography possession case.

## I.    Aggravating Factors

Mr. Valdez fully acknowledges the atrocious nature of his conduct and the other relevant conduct in this case, including admitting to knowingly possessing child pornography (including child pornography depicting toddlers and torture) on the computer he kept at his residence in military housing. There is no need for the Court, as the government has suggested, to question Mr. Valdez's "consciousness of guilt." *See* ECF No. 33 at PageID.393. Mr. Valdez has never denied being conscious of his own guilt. In fact, the opposite is true. He pled guilty about five months after he was arrested, owning up to his crime without any real delay.

---

[2] *See* ECF No. 28 at 4-10.
[3] A defense review of Mr. Valdez's personal computing system at FBI headquarters revealed that there were over 400,000 media files on the computer.

3

Nor in this case has Mr. Valdez denied being a part of the Discord Community that the PSR refers to as "Greggy's Cult." Over a two-to-three year span, Greggy's Cult engaged in truly horrifying acts of on-line exploitation, including the on-line sexual exploitation and abuse of adolescents and children. That exploitation seems to have been driven by little more than nihilism, egoism, and a drive to engage in ever more shocking and offensive on-line conduct to garner some twisted form of clout. The existence of these on-line communities is truly unimaginable for nearly anyone who grew up in a pre-internet world.

The Court can, indeed under §3553(a) must, consider Mr. Valdez's participation in Greggy's Cult in arriving at a proper sentence in this case. Mr. Valdez fully acknowledges that, and he understands that his crime warrants a significant sentence. The Court must also, however, view Mr. Valdez's behavior within a broader contextual framework. And it must not buy into the government's efforts to hammer that context into a two-dimensional, black-and-white picture that sheds little light on the nuances that should inform the Court's sentence.

The Greggy's Cult exploitation enterprise appears to have unraveled sometime in January of 2021; at least that is the latest date charged in the comprehensive indictment in the Eastern District of New York. *See United States v. Bermudez, et. al.,* 25-CR-361, ECF No. 8 (Indictment), Nov. 18, 2025. The search of Mr. Valdez's residence that precipitated this case took place on May 31, 2024.[4] PSR

---

[4] Mr. Valdez was not arrested until May 19, 2025.

at ¶ 16. The Court should not accept the government's efforts to shift the burden of proving what happened between January 2021 and May 2024 to Mr. Valdez. Nor should it rely on the government's wholesale speculation about what might have happened between those dates.

For example, the government asserts that the Court "need not fall into the technical weeds" of trying to figure out when Mr. Valdez last accessed the child pornography files that were found on his computer following the 2024 search. They make this claim after several paragraphs where they suggest that maybe Mr. Valdez created the encrypted containers[5] and/or accessed the child pornography after he moved to Hawaiʻi. Ultimately, however, the government acknowledges that the "assumption of accurate metadata is misplaced." *See* ECF No. 33 at PageID.389-93. It's not clear why the government concentrates on whether Mr. Valdez might have accessed the contraband after he moved to Hawaiʻi. The thing that would help inform the Court's sentencing decision is data about when he last accessed the files or stashed them in an encrypted drive, not where he was when he did so. But the government has not provided that information to the Court, and they concede that the information that they have provided does nothing to help resolve the issue.

---

[5] The Criminal Complaint in this case references a video found on Mr. Valdez's computer wherein the computer operator virtually decrypted the M.2 container on May 2, 2021. *See* ECF No. 1 at PageID.11-12. It, therefore, appears clear that the M.2 Container was created long before Mr. Valdez moved to Hawaiʻi.

5

Instead, the government encourages the Court to speculate about the ways that Mr. Valdez could have accessed the files without creating a metadata trail. *See, e.g.,* ECF No. 33 at PageID.392-93. This includes the far-fetched notion, unrooted in any evidence, that Mr. Valdez may have been so hungry to view child pornography, but apparently so worried about creating a digital trail should he be caught, that he might have savvily "consumed" the child pornography files on his computer by looking at their image icons without opening them. *Id.* This despite providing no actual proof of him doing so.

The government engages in similar unbridled speculation throughout its sentencing memorandum. They argue, "Certainly, the [Discord] confederate's disappearance from Discord and his subsequent prosecution are reasons for the defendant to have used the encryption tool that he did and to have squirrelled away his stash when he did." *Id.* at PageID.391-92. The government makes this argument while at the same time later admitting that they cannot say when Mr. Valdez created the encrypted drive or when he added the contraband files to it. The confederate was arrested in June 2021. Did Mr. Valdez stash the files then? The news of the confederate's prosecution "hit the interwebs in 2023." *Id.* at PageID.391. Or did Mr. Valdez stash them then? The government doesn't say. They have full access to Mr. Valdez's personal and Navy computers, but they don't point the Court to a single instance of Mr. Valdez searching for or mentioning "Zachary Dosch" at any time. Their speculation that Mr. Valdez knew about Dosch's prosecution

6

amounts to the existence of two press links—one a press release from the New Mexico U.S. Attorney's Office and one a two-sentence news report from an Albuquerque TV station—neither of which mentions Dosch's Discord username[6] and both of which focus on Snapchat, not Discord. The government points to no evidence that Mr. Valdez actually saw either report or any other press coverage of Mr. Dosch's prosecution—whether in 2021 or 2023.

There is plenty of aggravation in this case. The facts are, on their face, troubling enough to warrant serious attention by the Court. Given that, there is no need to overreach in an effort to paint Mr. Valdez in an unfairly prejudicial light. He has accepted responsibility for what he has done. He should be sentenced for that troubling conduct. He should not be sentenced based on speculation, conjecture, or unsupported assertions. With that in mind, a few things should be noted about certain information that the government highlights in its sentencing memorandum, particularly when looking at whether, as the government claims, Mr. Valdez "continued to be a [dangerous person] after he moved to Hawaii." ECF No. 33 at PageID.393-94.

First, Mr. Valdez's statement, from October 2020, that "Oh yeah, I do it all the time. I get bored. Normal porn won't do it for me anymore[,]" *see* ECF No. 33 at

---

[6] When interviewed by investigators in 2021, Dosch told investigators that "he was unaware of [Duck's] personal information (first name or appearance)." The government has provided no information indicating that Mr. Valdez was aware of Dosch's real name or his location.

Page ID.394, was made in the context of a back-and-forth message exchange amongst Discord users. Specifically, it was made in response to another user's jibe, "[Duck], you probably watch it [child pornography] on your free time." PSR at ¶ 18. In context, Mr. Valdez's response appears to be a sardonic (and inappropriate) joke made by a seventeen-year-old enmeshed in an execrable on-line community centered around shock value. Despite the trove of digital data available to the government in this case, they do not point to any other information that indicates that Mr. Valdez had any sexual interest in child pornography. The government clearly zeroes in on this statement to suggest to the Court that Mr. Valdez has some pedophilic tendency, but offers no other support for that conclusion.

The government also elides important context when it dates statements by Mr. Valdez's "confederate" (Zachary Dosch, AKA "MN") as "2024." *See* ECF No. 33 at PageID.394. As noted, Dosch was arrested in June 2021. So, any information he had to share about Mr. Valdez (whom he knew only as Duck) or anything he saw him do, predated June 2021. *See* PSR at ¶10. It had nothing to do with Mr. Valdez as he was in 2024, after Greggy's Cult disbanded, and Mr. Valdez joined the Navy.

The same blurring of context occurs in the government's concentration on statements by a "former romantic partner," which the government dates as "2025." Though this interview took place in 2025, as stated in the PSR, Mr. Valdez and this person dated in 2018 or 2019 when they were both 15 or 16 years old. PSR at ¶ 25. She told investigators that she had not seen Mr. Valdez in five years, that is since

8

they were both 17 or 18 years old. *Id.* Along with leaving out critical temporal context, the government also fails to mention several other relevant portions of this person's statement.[7] For example, she described her relationship with Mr. Valdez "as one of her more normal relationships." She also told investigators that she "does not recall being pushed by [Mr. Valdez] to engage in self-harm, but states that it was more on her own." And despite focusing on her statement that Mr. Valdez "was a rather dark person," the government leaves out that she specifically also told investigators that because Mr. Valdez "struggle[d] at lot" with his parents, she "did not believe [Mr. Valdez] being 'dark' was 'actually real.'"

The Navy command's statement, elicited after Mr. Valdez was charged in this case, that they "lost all confidence and trust in [Mr.] Valdez" sheds little light on anything meaningful to sentencing. Given Mr. Valdez's arrest, prosecution, and conviction, the Navy's loss of confidence seems natural and obvious. The statement, however, says nothing about Mr. Valdez's work or how the Navy viewed him prior to his arrest.

Perhaps most troubling is the government's attempt to smear Mr. Valdez as a racist. The statement that Mr. Valdez "hate[s] non-aryan folks" comes from a chat thread spanning from 2020 to 2023 that is summarized in one paragraph in an FBI report. No other context is given. The former romantic partner's report that

---

[7]    In discovery, the defense was provided with only an FBI 302 summarizing the statement.

Mr. Valdez was "openly racist against black people" was made within a statement in which she also claimed that Mr. Valdez would "dox people who he heard being racist . . . on the internet." *See* PSR at ¶ 25. And, again, this young woman's relationship with Mr. Valdez took place when they were both between 15 and 18 years old. Mr. Valdez is of Mexican descent, so it seems unlikely that he hates non-Aryan people. More significantly, the government does not point to a single other person who has known, worked with, or interacted Mr. Valdez in the past several years who claims that he is actually racist. The government has broad-ranging access to Mr. Valdez's computers and his phone, and this is the only evidence they have come forward with to make the highly prejudicial, inflammatory, and irrelevant claim that he is racist.

## II.     The Flaws in USSG §2G2.2

As outlined in his Sentencing Statement, Mr. Valdez continues to object to the application of the 5-level enhancement under USSG §2G2.2(b)(7)(D). *See* ECF No. 28 at 4-10. Based on that objection, Mr. Valdez should receive only a 2-level enhancement for possessing between 10 and 150 images. *Id.* at 9-10.

The 2-level enhancement for use of a computer under §2G2.2(b)(6) does properly apply in this case (as it does in seemingly every other case under §2G2.2), but, as a policy matter, the Court should disregard that enhancement when it sentences Mr. Valdez. Section 2G2.2's use of a computer enhancement has been subject to significant criticism. In its 2012 *Child Pornography Report*, for example,

10

the Sentencing Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," guideline §2G2.2 "fail[s] to differentiate among offenders in terms of their culpability." *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (Dec. 2012) ["*Child Pornography Report*"], iii, xi, 209, 323. More than a decade ago, the Commission recommended that the specific offense characteristics related to the types and volume of images, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability" and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23. Such revisions "should create more precisely calibrated enhancements that provide proportionate penalty levels based on the aggravating circumstances present in the full range of offenders' collecting behavior today." *Id.* at 323. These updates have not yet happened, and §2G2.2 is just as flawed now as it was in 2012 when the Commission's report was first issued.

Because the use of a computer enhancement applies to almost all defendants subject to sentencing under § 2G2.2, it's a useless measuring stick by which to judge an individual defendant's culpability. In fiscal year 2023, for example, 97.1% of defendants were subject to the heavily-criticized, 2-level upward adjustment for the use of a computer. This enhancement has become ubiquitous and meaningless, as it

does nothing to distinguish between offenders. For that reason, the Court should disregard it on policy grounds.

### III.    Mitigating Factors

The mitigation in this case is both broad and significant. The mitigation present here also puts Mr. Valdez on different footing than his co-defendants in the Eastern District of New York. Some mitigating facts can be dealt with rather quickly. But that does not make them any less important.

Despite the shocking nature of the offense, Mr. Valdez still enjoys the support of his parents, both of whom have written letters to the Court. *See* Exhibit A. Their support will be critical to Mr. Valdez, both while he navigates the unfamiliar challenges of federal prison and as he works to rebuild his life upon release. Mr. Valdez also has absolutely no prior criminal history, including juvenile or adult arrests, adjudications, or convictions. There's zero indication that he's ever been in any sort of serious trouble before. He has no history of substance abuse. He joined the Navy a few months after his 18th birthday, and he was sent off for training a few months later. Over the next several years of service, he engaged in training and education that gave him marketable skills. His service in the Navy enabled him to find a useful outlet for his computer talents.

The government seems to suggest that Mr. Valdez may have joined the Navy because he was spooked about getting caught and prosecuted for his role in Greggy's Cult. As discussed, there's no evidence to support that theory. But, even if there

12

was, it is hard to see why that would be an aggravating, rather than mitigating, factor. As someone who had barely turned 18, Mr. Valdez decided to get away from the destructive on-line extortion that he was involved in and tried to build a productive future for himself. We consistently talk about deterrence as a useful byproduct, indeed aim, of the criminal justice system. If Mr. Valdez was deterred, even in part, from continuing to engage in destructive on-line extortion by the prospect of prosecution, doesn't that mean that the system worked on him? The important thing is that nothing has been provided to suggest that Mr. Valdez continued to accumulate child pornography material, that he continued to distribute such material, or that he continued to engage in the disturbing on-line abuse that marked his teenage years.

True, Mr. Valdez kept and secreted away some of the child pornography material that he had acquired. He also held onto some evidence of his prior exploitation. We would not be here if he had not. That was criminal and condemnable. He takes full responsibility for all of the corrupt choices he made before and after he joined the Navy. He understands that his criminal conduct warrants significant punishment, and he knows that he must work to gain new insight through treatment in order to understand the impact that his offenses had on his victims and to figure out what it was within him that drove his crimes. Reading through the victim impact statements in the PSR was a truly jarring experience for him. This was the first time that he came face-to-face with the true

13

weight of what he has done. He is highly motivated to engage in treatment, to satisfy his restitution obligations, and to try to find other ways to make amends. He has written a letter to the Court, which is attached as Exhibit B.

Mr. Valdez's age is certainly the most significant mitigating factor in this case. He was just 15 or 16 years old when he became entwined in Greggy's Cult. He was barely 18 years old when that group fully unraveled. He was 21 when the Navy relocated him to Hawai'i. He was just 22 when federal agents raided his apartment and his whole future changed. He turns 23 later this month. The Court should take special note of the fact that most of the truly aggravating relevant conduct detailed in the PSR happened while Mr. Valdez was still a minor. His age is not just a number. It reflects a significant shift in the way the Court must evaluate the proportionality of the sentence it imposes here.

Courts have long recognized that minors "are constitutionally different from adults for the purposes of sentencing. Because juveniles have diminished capacity and are greater prospects for reform, . . . they are less deserving of the most severe punishments." *Miller v. Alabama*, 567 U.S. 460, 470 (internal quotations and citation omitted). In the context of sentencing, the Supreme Court has explained the "significant gaps" that exist between juveniles and adults:

> First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And

14

third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

Our decisions rested not only on common sense—on what any parent knows—but on science and social science as well. In *Roper*, we cited studies showing that only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. And in *Graham*, we noted that developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control. We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed.

*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because the heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult. Nor can deterrence do the work in this context, because the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment.

*Id.* at 471-72 (cleaned up) (internal citations omitted).

In *Roper,* the Supreme Court noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior." *Roper v. Simmons,* 542 U.S. 551, 569 (2005) (citation omitted). The Supreme Court further acknowledged that "juveniles are more susceptible to negative influences and outside pressure, including peer pressure[,]" and that "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 569-570 (citations omitted).

15

Similarly, in *United States v. Gall*, the Supreme Court quoted with approval the following reasoning advanced by a district judge while sentencing a 21-year-old drug trafficking defendant:

> Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. The recent National Institute of Health report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

128 S.Ct. 586, 601 (2007) (ellipsis and brackets omitted). In *Gall*, the Supreme Court held that "it was not unreasonable for the District Judge to view [the defendant's] immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future. Indeed, [the judge's] consideration of that factor finds support in our cases." *Id.*

These conclusions are well supported by "research [that] shows that adolescents are generally less aware of risks because they have less knowledge and experience than adults, and they typically discount the long-term consequences of their decisions because of developmental differences in temporal perspective." *See* Elizabeth S. Scott, *Criminal Responsibility in Adolescence: Lessons from Developmental Psychology*, in YOUTH ON TRIAL: A DEVELOPMENTAL PERSPECTIVE ON JUVENILE JUSTICE 304 (2000). This decreased awareness can be attributed, in part, to the fact that adolescents' "prefrontal cortexes are not yet fully developed . . . [and

16

therefore] they do not possess the cognitive ability to appreciate fully the long-term consequences of their behavior." Kimberlianne Podlas, *The Legal Epidemiology of the Teen Sexting Epidemic: How the Media Influenced Legislative Outbreak*, 12 PITT. J. TECH. L. & POL'Y 1, 9 (2011). "Studies have shown that brains continue to mature and develop throughout childhood and adolescence and well into early adulthood." American Academy of Child & Adolescent Psychiatry, *Teen Brain: Behavior, Problem Solving, and Decision Making,* Sept. 2016, at https://bit.ly/30zFhIM ("*Teen Brain*"). The critical parts of the brain involved in decision-making are not fully developed until approximately the age of twenty-five. *See* NPR, *Brain Maturity Extends Well Beyond Teen Years,* Oct. 11, 2011, at https://n.pr/3fVkiGU. Adolescents' "actions are guided more by the emotional and reactive amygdala and less by the thoughtful, logical frontal cortex." *Teen Brain.* Clearly, Mr. Valdez did not think through the consequences of his behavior, or the impact his behavior had on his victims, which is consistent with the weight of research dealing with adolescent males and criminality. It is not enough to chalk Mr. Valdez's behavior up to callousness or compulsive, permanent criminality. His criminal offending must be viewed through the lens of his youth and immaturity.

In determining an appropriate sentence here, the Court should certainly place great emphasis on the fact that most of the relevant conduct that forms the bulk of the aggravation in this case occurred when Mr. Valdez was a juvenile. The Discord group in this case "targeted and groomed minor victims who were often

17

racial minority youth [and] minors struggling with mental health issues such as depression[.]" PSR at ¶ 9. Mr. Valdez shares these same traits. With the exception of Camden Rodriguez, moreover, all of Mr. Valdez's co-defendants in the Eastern District of New York are significantly older than he is. *See* U.S. Dept. of Justice, *Press Release: Five Members of "Greggy's Cult" Charged with Sexually Exploiting Children on the Internet,* at 4, Dec. 2, 2025, available at: https://bit.ly/3OVpe4E (attached as Exhibit C). Each of these co-defendants was an adult during the heyday of Greggy's Cult, and that alone makes them more culpable.

Unlike Mr. Valdez, moreover, there is evidence that his co-defendants in the New York case continued to engage in sexual exploitation of children after Greggy's Cult dissolved. As of his arrest in 2025, Hector Bermudez, who is at least seven years older than Mr. Valdez, "continue[d] to use discord to solicit CSAM and groom at least two minors to create CSAM[.] *See United States v. Hector Bermudez*, 25-CR-361, ECF No. 14 at 5 (attached as Exhibit D). Similarly, recent CyberTips reported that David Brilhante "was previously engaged in child exploitation conduct and was currently 'still up to his disgusting deeds.'" *Id.* at 5-6. Other reports indicated that Camden Rodriguez is still "very active in child abuse communities on the Internet" and "was still engaged in extortion and pedophilia." *Id.* at 6. Zachary Dosch, as the Court is aware, was arrested in June 2021, and his continued incarceration made it impossible for him to continue to abuse children. Thus, it appears that Mr. Valdez is

18

the only one of his co-defendants that voluntarily attempted to distance himself at all from the continued exploitation of minors on the internet.

Finally, the Court should consider the fact that inmates are often subject to various forms of victimization within correctional institutions – including sexual, economic, psychological, and social victimization. Mr. Valdez's age, small stature, physical weakness, immature appearance, and lack of prison experience make him an obvious target for exploitation and victimization while incarcerated.[8] These factors, especially coupled with his status as a child pornography offender, make him an exceptionally likely target for prison violence, including assault and rape.

The Sentencing Commission has long recognized that "[p]hysical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." *See* U.S.S.G. § 5H1.4 (2024).[9] The Supreme Court has similarly held that a district court

---

[8]    Mr. Valdez is 5'7" tall and weighs 112 pounds.

[9]    Most of the provisions of the Guidelines related to appropriate reasons for sentencing departures, including §5H1.4, were eliminated by the Commission in 2025. *See* USSG Annotated 2025 Chapter 1, available at: https://bit.ly/3ZUY4NI. "The Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a). The removal of departures from the Guidelines Manual does not limit the information courts may consider in imposing a sentence nor does it reflect a view from the Commission that such facts should no longer

may consider a defendant's unusual susceptibility to prison abuse when determining an appropriate sentence. *See Koon v. United States,* 518 U.S. 81, 106-08, 111-12 (1996). The Commission acknowledges the propriety of considering a defendant's age and physical condition when, in the sentencing court's view, they present an extraordinary situation. Here, Mr. Valdez's immature appearance, physical fragility, and status as a sex offender, create just this type of extraordinary situation because of his particular and unusual vulnerability to victimization, exploitation, and trauma at the hands of fellow inmates.

## IV.    Conclusion

The conduct engaged in by Mr. Valdez and the other members of Greggy's Cult is truly appalling. That is something that Mr. Valdez acknowledges without caveat. No argument made by counsel in this memorandum should be interpreted by the Court as Mr. Valdez shying away from his actions or their impact on his victims. The Court must, however, fashion a sentence that comports with the requirements of §3553(a), taking into account the good and the bad, the ugly and the hopeful. Shock and outrage, uncoupled from context, rarely make for appropriate or just sentencing outcomes. Sentencing cannot be a one-size-fits-all endeavor, and a holistic look at this case and what preceded it demonstrates that Mr. Valdez is significantly less culpable than the other members of Greggy's Cult. While he deserves a significant sentence, the sentence proposed by the government

---

inform a court for purposes of determining the appropriate sentence." *Id.*

is far greater than necessary to achieve the statutory purposes of sentencing given Mr. Valdez's rather unusual circumstances.

For all the reasons argued above, the Court should sentence Mr. Valdez to a term of incarceration of 60 months, to be followed by an appropriate term of supervised release pursuant to the conditions that the Probation Office has outlined in the PSR.

DATED:  Honolulu, Hawaii, February 25, 2026.

/s/ Craig W. Jerome
CRAIG W. JEROME
Attorney for Defendant
RUMALDO VALDEZ

21

**Table of Authorities**

**Cases**                                                    **Page (s)**

*Koon v. United States,* 518 U.S. 81, 106 (1996). ............................................... 20

*Miller v. Alabama,* 567 U.S. 460 (internal quotations and citation omitted) .... 14

*Roper v. Simmons,* 542 U.S. 551 (2005) (citation omitted) ............................. 15

United States v. Bermudez, et. al., 25-CR-361 (D. Hawaii)......................... 4, 18

*United States v. Gall,* 128 S.Ct. 586, (2007) (ellipsis and brackets omitted) ... 16

**Statutes**

18 U.S. Code § 3553 ...................................................................................... 4, 19

**Sentencing Guidelines**

USSG Annotated 2025 Chapter 1, available at: https://bit.ly/3ZUY4NI ......... 19

U.S.S.G. § 2G2. 2 ............................................................................... 2, 3, 10, 11

U.S.S.G. § 5H1.4 (2024) ..................................................................................... 19

U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography
      Offenses (Dec. 2012) ["Child Pornography Report"], iii, xi, 209 .... 10, 11

**Other Authorities**

American Academy of Child & Adolescent Psychiatry, Teen Brain:
      Behavior, Problem Solving, and Decision Making, Sept. 2016, at
      https://bit.ly/30zFhIM ("Teen Brain") .................................................... 17

Elizabeth S. Scott, Criminal Responsibility in Adolescence:
      Lessons from Developmental Psychology, in YOUTH ON TRIAL:
      A DEVELOPMENTAL PERSPECTIVE ON JUVENILE
      JUSTICE 304 (2000) ............................................................................. 16

**Table of Authorities**

**Other Authorities (continued)**                                                 Page (s)

Kimberlianne Podlas, *The Legal Epidemiology of the Teen Sexting*
     *Epidemic: How the Media Influenced Legislative Outbreak,*
     12 PITT. J. TECH. L. & POL'Y 1, 9 (2011)............................................ 17

NPR, *Brain Maturity Extends Well Beyond Teen Years,* Oct. 11, 2011,
     at https://n.pr/3fVkiGU ........................................................................ 17

U.S. Dept. of Justice, *Press Release: Five Members of "Greggy's Cult"*
     *Charged with Sexually Exploiting Children on the Internet,* at 4,
     Dec. 2, 2025, available at: https://bit.ly/3OVpe4E ................................. 18

<u>CERTIFICATE OF SERVICE</u>

Craig W. Jerome hereby certifies that a true and correct copy of the foregoing

was served on the following via email on February 25, 2026.

Jonathan D. Slack          Jonathan.Slack@usdoj.gov
Wayne A. Myers             Wayne.Myers@usdoj.gov
Assistant United States Attorneys
300 Ala Moana Boulevard, Room 6100
Honolulu, Hawaii 96850

Attorneys for Plaintiff
UNITED STATES OF AMERICA

Albert Bahn                albert_bahn@hip.uscourts.gov
United States Probation Officer
300 Ala Moana Boulevard, Room 2300
Honolulu, Hawaii 96850

DATED:   Honolulu, Hawaii, February 25, 2026.


 /s/ Craig W. Jerome
CRAIG W. JEROME
Attorney for Defendant
RUMALDO VALDEZ